UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CELLCO PARTNERSHIP,
d/b/a VERIZON WIRELESS,

                    Plaintiff,

        v.                                                CAUSE NO. 3:23cv913 DRL

CITY OF ELKHART BOARD
OF ZONING APPEALS,

                    Defendant.

<u>OPINION AND ORDER</u>

Petitioner Cellco Partnership d/b/a Verizon Wireless (Verizon) returns post-remand to assert that the Elkhart Board of Zoning Appeals (BZA) violated the Telecommunications Act of 1996 (TCA) and state law. The court previously found for Verizon—holding that the BZA's original decision to deny an application for a use variance to site a 135-foot wireless communication facility (monopole) was not "in writing," as was required. *See* 47 U.S.C. § 332(c)(7)(B)(iii). The court remanded this matter to the BZA to issue a TCA-compliant decision. The BZA reheard and denied the petition with a written decision. On this second wave of administrative review, both sides request judgment. The court denies Verizon's motion and grants judgment in full to the BZA.

BACKGROUND

In August 2023, Heidi Gaskill, trustee of the Heidi Gaskill Revocable Trust, petitioned the BZA for a use variance to place a Verizon cellular communication monopole on the Trust's property in Elkhart, Indiana [R. 1]. The Trust needed the variance because the property was zoned for low-density, single-family residential development, and the monopole was not a

permitted use under Elkhart's zoning ordinance [R. 2 ¶ 2, 667]. This wasn't Verizon's first attempt to secure a location—it previously tried to lease property from the Elkhart Department of Parks and Recreation to site a monopole in Pinewood Park, but, as it turned out, the contract was invalid and efforts were abandoned when Elkhart determined that entering into the lease was beyond the department's legal authority [R. 504-563, 594].

The BZA first heard the Trust's variance application at a public hearing on September 14, 2023 [R. 286-90]. Doug Dolan of Dolan Realty Advisors gave a presentation to support the petition on behalf of the Trust [R. 286-87]. City staff submitted a report recommending the BZA approve the variance [R. 458-60]. Members of the public spoke both for and against the petition [R. 287-89]. The BZA unanimously (3-0) voted to deny the variance petition during the hearing, but no board member provided an explanation for his or her vote [R. 290]. The BZA also sent a letter to the Trust dated September 27, 2023 that confirmed the variance denial, but it too failed to give reasons for its decision [R. 8].

Verizon commenced this action on October 16, 2023 as an interested party aggrieved by the BZA's denial of the variance. The company requested expedited review, claimed the BZA's decision violated the TCA and Indiana law, and sought an injunction and writ of mandamus compelling the BZA to issue the use variance. Once the BZA filed its answer, the court set a briefing schedule; and, on April 30, 2024, Verizon moved for summary judgment, arguing the BZA's decision violated the TCA—including its in-writing, substantial evidence, and effective prohibition requirements, 47 U.S.C. §§ 332(c)(7)(B)(i)(II), (iii)—and Indiana law. Briefing concluded June 20, 2024.

On September 6, 2024, the court granted Verizon summary judgment. *Cellco P'ship v. City of Elkhart Bd. of Zoning Appeals*, 2024 U.S. Dist. LEXIS 160483 (N.D. Ind. Sep. 6, 2024). The BZA's failure to provide written reasons for denying the variance petition violated the TCA's in-writing requirement. *See* 47 U.S.C. § 332(c)(7)(B)(iii); *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 300 (2015). The court found that the lack of articulated reasons precluded its review. Because the TCA leaves the remedy for such a violation unspecified and because administrative law ordinarily expects errors to be remanded to the agency save in rare circumstances, the court remanded the matter to the BZA to issue a TCA-compliant decision within six weeks.

On October 4, 2024, Verizon moved to alter the judgment, arguing the court's remand was erroneous and asking the court to assess its remaining claims, or alternatively to specify that the BZA could not conduct a new hearing on remand and instead was required to state reasons for its decision based only on the existing record. *See* Fed. R. Civ. P. 59(e). On February 7, 2025, the court denied the motion. *Cellco P'ship v. City of Elkhart Bd. of Zoning Appeals*, 765 F. Supp.3d 763 (N.D. Ind. 2025). The court explained that remand was lawful and appropriate, and that, under foundational administrative law principles, the BZA could either provide evidence of its rationale for the variance denial (but not *post hoc* rationalizations) or reach a new decision, without other court-mandated constraints. With the latest motion resolved, the court ordered the BZA to issue a TCA-compliant decision by April 8, 2025. Verizon appealed the summary judgment and Rule 59(e) order, but then later voluntarily dismissed the appeal.

The BZA reheard the Trust's variance petition just over a month later, on March 13, 2025 [R. 462]. In lead up to the hearing, indeed as of February 14, 2025, though with little explanation, city staff recommended that the BZA approve the variance [R. 362], and the meeting agenda

included the staff's original report (dated September 14, 2023) and original recommendation [R. 400, 417-19]. On March 12, 2025, the day before the hearing, staff issued an amended report recommending the variance be denied [R. 455-57]. The amended report found that approving the variance would be detrimental to the natural viewshed from the surrounding properties, would negatively impact the value of surrounding homes, and would be inconsistent with Elkhart's zoning ordinance and Comprehensive Plan [R. 456].[1] Verizon submitted a letter to the BZA objecting to the revised report [R. 393-98].

At the start of the March 13 hearing, the BZA informed attendees that any petitioner or interested party could appeal its decision in an appropriate court no later than 30 days after the decision [R. 292]. It also said the petitioner could first file a motion for rehearing within 14 days of the BZA's decision [*id.*]. Dolan Realty Advisors again gave a presentation to support the variance request, including information on the need for the facility, its safety, and impacts on surrounding property values [R. 248-69, 293-95]. On need, he provided material from Verizon network and radiofrequency engineers showing there was a gap in reliable in-residence and in-vehicle service around the proposed site and how the proposed monopole would address the gap [R. 249, 251-53, 293-94].

---

[1] The City of Elkhart Comprehensive Plan, adopted February 2, 2015 and intended to cover the following twenty years [R. 780], is Elkhart's guide for making land use decisions, preparing capital improvement programs, and determining the rate, timing, and location of future growth, based on establishing long-term vision, goals, and objectives that direct investment and development activity within the locality [R. 791-92]. It incorporates the planning themes of land use, transportation, environment and design, and economic development, and reflects the requirements for comprehensive plans specified by Indiana law [R. 792]. *See* Ind. Code § 36-7-4-502 (comprehensive plan must contain at least a statement of objectives for future development, a statement of policy for land use development, and a statement of policy for the development of public ways, public places, public lands, public structures, and public utilities).

On safety, Dolan Realty presented a letter from a structural engineer that explained the monopole was designed according to industry standards and international building codes [R. 260, 294-95]. The engineer said monopole failures are extremely rare, storm-related failure would require highly unlikely winds greater than 150 miles per hour, and failures usually only result from an act of God, uncontrollable vandalism, or gross neglect of routine maintenance [*id.*]. Finally, Dolan Realty presented excerpts from a report by a certified appraiser—the firm CohnReznick—on the proposed monopole's expected impacts on nearby property values [R. 264-67, 295]. The report evaluated peer-authored studies (studies by other real estate valuation experts), impacts from comparable cell towers in the local area, and an interview with a local assessor [R. 264-67]. It found that cell towers don't negatively impact adjacent property values [R. 267]. The report was publicly available [*id.*].

The BZA next heard from community members in favor of the monopole [R. 296-97]. Heidi Gaskill and two others explained that they had professional real estate experience and didn't anticipate adverse impacts on property values [*id.*]. They, and one other local resident, also discussed the importance of strong cell service for emergency response, persons who work from home, and keeping up with advancing technology [*id.*].

Eleven Elkhart residents spoke against the monopole [R. 297-301]. Nine questioned whether a coverage gap existed, saying they had no issues with dropped calls or other cell services near the proposed site and citing other data [*id.*]. Five voiced aesthetic concerns that the structure would be an eyesore and thereby detract from their enjoyment of the neighborhood [*id.*]. Three said the monopole didn't fit with the area's zoning character [R. 297-99], and three raised

concerns about negative impacts on nearby property values [R. 298-99, 301]. Some residents expressed safety concerns, including worries about radiofrequency emissions [R. 298-301].

Dolan Realty (through Mr. Dolan) testified in response to this opposition. In addition to addressing concerns about the height of the structure, coverage gap, property value impacts, and tower safety, he explained some of the site selection process [R. 302]. He said "we looked at a total of fourteen sites" where there was a coverage gap and concluded that the Bristol Street location was "the primary site and the best site in the search area" [R. 195-96]. He said the other sites were "lesser . . . either through reasons of stormwater, flood plain, not enough room, not enough size, perhaps a landlord that was not interested, multiple reasons" [*id.*]. He earlier said certain sites—such as Walker Park and an unspecified church—didn't provide tree or other "coverage or concealment for [the] facility" [R. 133].

Verizon's counsel also argued in support of the variance. She discussed the coverage gap, the evidence presented about property value and aesthetic impacts, and the change in the staff's recommendation [R. 302-03]. She echoed Dolan Realty, saying "they've studied many other possible locations" and "this is the best location in the search ring" [R. 200].

The BZA voted unanimously (4-0) to accept the staff's findings of fact and to deny the variance petition [R. 304]. Each member expressed reasons for their decisions, though they built from the staff's report or the record [R. 208-10]. On March 18, 2025, the BZA sent a letter (dated the day before) to the Trust confirming the denial [R. 10, 13]. Aside its mention of the staff report and accepting the staff's findings, the letter offered six reasons, explaining that the tower would "harm the natural viewshed of the surrounding properties," "adversely affect the property values of the surrounding properties," "interfere substantially with the comprehensive plan because it

calls for low-density residential uses," "serve as an attractive nuisance," "be unsightly," and "not [be] compatible with the zoning ordinance in the R-1 district" [R. 13].

On April 17, 2025, Verizon amended its complaint, then on April 30 moved to reopen the case and for leave to amend. After briefing, including a motion to strike from the BZA, the court struck Verizon's first amended complaint, granted Verizon leave to file a second amended complaint, denied the BZA's motion to strike as presented, and denied Verizon's motion to reopen the case as unnecessary. On June 24, Verizon filed its second amended complaint; and, after the BZA's answer, the court entered a briefing schedule.

On August 30, Verizon moved for judgment on its claims that the variance denial was not supported by substantial evidence, that the BZA effectively prohibited Verizon from providing wireless services, that the variance application wasn't decided in a reasonable amount of time, and that the denial violated Indiana law. Verizon asked for an injunction requiring the variance be issued. On September 29, the BZA responded and moved for summary judgment on all claims in Verizon's second amended complaint, including those alleging violations of the TCA's in-writing requirement and its bar on basing a decision on the effects of radiofrequency emissions. The court permitted the BZA a surreply limited to its cross-motion for summary judgment. Briefing concluded on November 3, 2025.[2]

## STANDARD

Different standards apply to different claims, but in large measure this case presents as one of administrative review (both under federal and state law). The standard of review when the court sits in an appellate capacity for a TCA claim is whether the municipal body's decision was

---

[2] The court commends the parties for their organization of the record and on the overall quality of their briefing.

supported by substantial evidence. *See* 47 U.S.C. § 332(c)(7)(B)(iii); *Helcher v. Dearborn Cnty.*, 595 F.3d 710, 723 (7th Cir. 2010); *PrimeCo Pers. Commc'ns, Ltd. P'ship v. City of Mequon*, 352 F.3d 1147, 1148 (7th Cir. 2003). It is a conventional standard for judicial review of agency action. *See PrimeCo*, 352 F.3d at 1148; *VoiceStream Minneapolis, Inc. v. St. Croix Cnty.*, 342 F.3d 818, 830 (7th Cir. 2003). "The statutory phrase substantial evidence is a term of art in administrative law that describes how an administrative record is to be judged by a reviewing court." *Roswell*, 574 U.S. at 301 (quotations omitted).

"The substantial evidence standard is highly deferential to the local government making the decision." *Helcher*, 595 F.3d at 723. The court reviews the record "to see if it contains such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Aegerter v. City of Delafield*, 174 F.3d 886, 889 (7th Cir. 1999) (quotations and citations omitted). The threshold isn't high; substantial evidence is "more than a mere scintilla." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). There is little practical difference between the substantial evidence standard and the clear error standard, so another way to frame the question is whether the BZA clearly erred in refusing the variance. *Helcher*, 595 F.3d at 723; *cf. Dickinson v. Zurko*, 527 U.S. 150, 153 (1999). The party challenging the locality's decision bears the burden of proving that the decision lacked the support of substantial evidence. *Helcher*, 595 F.3d at 723.

In light of the summary judgment posture at times advanced today, rule-based summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor, construing the facts and all reasonable inferences in that party's favor. *Weaver v.*

*Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022); *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020); *see also Tegtmeier v. Midwest Operating Eng'rs Pension Tr. Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004) (concerning cross-motions). In the administrative review context, however, summary judgment is often just the procedural vehicle for asking the judge to decide the case on the basis of the administrative record—in effect, a request for the court to enter judgment as a matter of law based on the statutory standards that apply in review. *See, e.g., Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994); *see also Lalowski v. City of Des Plaines*, 789 F.3d 784, 794 (7th Cir. 2015). From here, the court will address applicable standards in the particular sections that follow.

## DISCUSSION

The TCA preserves a municipality's "authority . . . over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A); *see Roswell*, 574 U.S. at 300. It imposes limitations on that authority to ensure a locality cannot unreasonably slow the growth of cellphone and wireless services. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115-16 (2005); *PrimeCo*, 352 F.3d at 1148.

A local zoning board's decision to grant or deny a permit to place a wireless service facility must be made "within a reasonable period of time," 47 U.S.C. § 332(c)(7)(B)(ii), and "shall be in writing and supported by substantial evidence contained in a written record," 47 U.S.C. § 332(c)(7)(B)(iii). Regulation of such facilities also cannot "prohibit or have the effect of prohibiting the provision of personal wireless services," 47 U.S.C. § 332(c)(7)(B)(i)(II), or be "on the basis of the environmental effects of radio frequency emissions" to the extent facilities comply with Federal Communications Commission (FCC) regulations, 47 U.S.C.

§ 332(c)(7)(B)(iv). Anyone adversely affected by a locality's final action or failure to act may, within 30 days, petition for expedited review. 47 U.S.C. § 332(c)(7)(B)(v).[3]

Verizon's second amended complaint requests review of the March 13, 2025 variance denial and an injunction compelling the BZA to grant the variance petition. It alleges four violations of the TCA—the in-writing requirement (count one), the substantial evidence requirement (count two), the bar on regulations based on radio frequency emissions (count three), and effective prohibition of wireless services (count four)—and a violation of Indiana administrative law (count six). It also requests a declaratory judgment that the BZA's decision violated the TCA (count five). Verizon moves for judgment on counts two, four, and six, and additionally argues that the variance application was decided too late. The BZA cross-moves for summary judgment on all claims. The court addresses each in turn.

A. *"In Writing" Requirement (Count One).*

Under the TCA, a locality's decision to deny a use variance for a wireless facility "shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). The orderly functioning of substantial evidence review depends on such disclosure of a zoning board's decision. It empowers a reviewing court to "identify the reason or reasons why the locality denied the application" and ensure the decision wasn't discriminatory or based on impermissible factors. *Roswell*, 574 U.S. at 300; *see also id.* at 301-02 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)); 47 U.S.C. §§ 332(c)(7)(B)(i)(I), (iv).

_____

[3] Verizon amended its complaint on April 17, 2025, within 30 days of the BZA's March 18, 2025 written notice. The action is thus timely, as the clock runs from when the locality issues its "written notice of denial." *Roswell*, 574 U.S. at 305 n.4; *see e.g.*, *T Mobile Ne. LLC v. City of Wilmington*, 913 F.3d 311, 319-22 (3d Cir. 2019) (written decision, not oral decision, constitutes TCA "final action").

The BZA asks for summary judgment on this count, and Verizon doesn't defend against it. The company clarifies in briefing that it included this count to preserve for appeal the issue of whether remand was an appropriate remedy the last time. That argument has been well-trod at this point—indeed, Verizon won the issue that the BZA's last decision had not been reduced to writing. *See Aegerter*, 174 F.3d at 891 (district court enforced the procedural safeguard within the TCA by remanding for written findings before conducting substantial evidence review). But today, the argument necessarily fails because BZA memorialized its variance denial in a letter [R. 13]. The letter articulates the BZA's reasons. *See Helcher*, 595 F.3d at 722. No one explains why, on administrative review, this might ever become a jury question under a traditional Rule 56 standard, so the court grants the BZA judgment on count one as a matter of law.

B. *Substantial Evidence (Count Two).*

The parties debate whether substantial evidence supported the BZA's decision. The TCA requires the BZA's denial to be "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). The substantial evidence test is a safeguard directed at whether the locality's decision is consistent with applicable local zoning requirements. *VoiceStream*, 342 F.3d at 830; *Aegerter*, 174 F.3d at 891. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Helcher*, 595 F.3d at 723 (citation omitted). In searching for substantial evidence, the court must examine the entire record and assess evidence that bolsters the decision alongside whatever in the record fairly weighs against it. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *Aegerter*, 174 F.3d at 889; *Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985). But the court isn't looking for whether a genuine triable issue exists, only whether substantial evidence exists to support the BZA's decision, or not.

Verizon tweaks the standard a bit. The company contends that the BZA should not be entitled to any deference because the board made no findings of fact and demonstrated no attempt to weigh the evidence—what Verizon thus calls an "error of law." More specifically, based on Indiana precedent, Verizon argues that the BZA's stated reasons for denying the variance weren't premised on actual evidence and instead just impermissibly parroted the zoning ordinance. *See House of Prayer Ministries, Inc. v. Rush Cnty. Bd. of Zoning Appeals*, 91 N.E.3d 1053, 1058 (Ind. Ct. App. 2018) (when a party aggrieved by an administrative decision alleges the agency committed an error of law, no deference is afforded); *Riverside Meadows I, LLC v. City of Jeffersonville Bd. of Zoning Appeals*, 72 N.E.3d 534, 540 (Ind. Ct. App. 2017) (non-TCA zoning decision) ("if the BZA's findings are merely a general replication of the requirements of the ordinance at issue, they are insufficient to support the BZA's decision."). Verizon effectively lambasts the BZA's decision for failing to cite evidence and characterizes the BZA's citations to the record as impermissible *post hoc* rationalizations. *See Roswell*, 574 U.S. at 304 n.3.

These criticisms miss the mark. The TCA doesn't mandate that the BZA's decision cite to evidence. It only requires it "be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). The reasons "need not be elaborate or even sophisticated," *Roswell*, 574 U.S. at 302, and "nothing in [the TCA] imposes any requirement that the reasons be given in any particular form," *id.* at 303. The BZA denied the variance in writing, and the board gave sufficiently clear reasons for its decision such that the court can (this time) review the record to determine whether substantial evidence exists to support it. That is enough.

The court also follows the TCA-mandated standard as it has been written. *See* 47 U.S.C. § 332(c)(7)(B)(iii). The substantial evidence standard is not abject deference, much less a rubber

stamp, but it is "highly deferential to the local government making the decision." *Helcher*, 595 F.3d at 723. To the extent Verizon doesn't like the standard, its argument is with Congress. *See Aegerter*, 174 F.3d at 889.

In addition, whether merely parroting an ordinance's language would be impermissible (more on that in a moment), the BZA's denial went beyond this in truth. Rather than just recite the Elkhart's zoning ordinance, and rather than use the ordinance's requirements as a mere checklist, the BZA, at least at times, reasoned its denial based on considerations of aesthetics, property values, and disharmony with the zoning ordinance and Comprehensive Plan, and the staff's recommendation [R. 13]. To be sure, the staff report isn't devoid of mimicry.[4] But the staff report's recommendations went further, again at times, than whether the application merely complied with the zoning ordinance—in part it explained why not. And, even then, the staff report's recommendations were not the sum total of the BZA's reasons. Thus, to suggest the BZA's decision was always a rubber stamp of the zoning ordinance overlooks the written reasons the board provided.

---

[4] Under Elkhart's zoning ordinance, the BZA shall only grant a use variance when it specifically finds that (1) the "approval will not be injurious to the public health, safety, morals and general welfare of the community," (2) the "use and value of the area adjacent to the property included in the variance will not be affected in a substantially adverse manner," (3) the "need for the variance arises from some condition peculiar to the property involved," (4) the "strict application of the terms of [the Zoning] Ordinance will constitute an unnecessary hardship if applied to the property for which the variance is sought," and (5) the "approval does not interfere substantially with the Comprehensive Plan" [R. 760-61]. The staff report recommended denying the use variance based on the following findings, only parts of which echo the ordinance: (1) the "approval will be injurious to the public health, safety, morals or general welfare of the community because the proposed tower could be detrimental to the natural viewshed from the surrounding properties," (2) the "use and value of the area adjacent to the property will be affected in a substantially adverse manner because the tower's proximity to the surrounding existing residences could negatively impact the value of the surrounding homes," (3) the "need for the variance arises from some condition peculiar to the property because of the residential zoning and height of the proposed tower," (4) the "strict application of the terms of [the Zoning] Ordinance will not constitute an unnecessary hardship as the property can still be used for single family dwelling residential development," and (5) the "approval does interfere substantially with the Comprehensive Plan because the plan calls for low density residential uses" [R. 456].

It also cannot be said that the BZA's explanation for its decision rested merely on *post hoc* rationalizations (a reason impermissibly offered after the fact). *See Roswell*, 574 U.S. at 301-02; *see also Biden v. Texas*, 597 U.S. 785, 807-08 (2022); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20-21 (2020); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962). The BZA—no doubt newly constituted in its membership—elected to deal with the variance petition "afresh by taking new agency action." *DHS*, 591 U.S. at 21 (emphasis omitted). As such, the board was required to "comply with the procedural requirements for new agency action." *Id.* No one says the board didn't. The BZA's decision was contemporaneously in writing. It will be sufficient if supported by substantial record evidence, without it ever pointing to each piece of evidence with particularity. The court's task is to determine whether substantial evidence in the record supports the decision. In seeing to this task on administrative review, the court boils the BZA's seven reasons down to four, just as the parties smartly have done.

### 1. *Natural Viewshed for Surrounding Properties.*

The TCA permits local authorities to apply "general and nondiscriminatory standards derived from their zoning codes, and . . . aesthetic harmony is a prominent goal underlying almost every such code." *VoiceStream*, 342 F.3d at 831 (quoting *Aegerter*, 174 F.3d at 891); *see also Gen. Outdoor Advert. Co. v. City of Indianapolis*, 172 N.E 309, 312 (Ind. 1930) ("aesthetic considerations" are appropriate when "the regulation has a real or reasonable relation to the safety, health, morals, or general welfare"); *New Albany Hist. Pres. Comm'n v. Bradford Realty, Inc.*, 965 N.E.2d 79, 89 (Ind. Ct. App. 2012) (locality's ordinance promoted the "general welfare of the citizens" by "preserving the character and desirable aesthetic features of [the] city") (citations and quotations omitted); *Bowman v. Metro. Bd. of Zoning Appeals*, 331 N.E.2d 739, 741 (Ind. Ct. App. 1975) (decision was

supported by substantial evidence that "there would be no injury to the public health and general welfare of the area" because the use would protect "the aesthetic value . . . of the area").

"Although local governments are entitled to weigh the aesthetic effect of a wireless tower in deciding whether to permit its construction, generalized aesthetic concerns are not alone sufficient to justify a denial of a permit." *Helcher*, 595 F.3d at 723. A "local zoning board's aesthetic judgment must be grounded in the specifics of the case." *VoiceStream*, 342 F.3d at 831 (citation and quotation omitted). "A reasonable decision whether to approve a permit to construct a cellphone tower requires the local government to balance the contribution the tower would make to the availability of cellphone service against the detriments the tower presents to the surrounding community." *Helcher*, 595 F.3d at 723.

For example, in *VoiceStream*, substantial evidence that a tower would disrupt the aesthetic harmony of a picturesque riverway included the results of onsite investigations, pictures from a "crane test" that showed how the proposed structure would impact the viewshed, maps that documented the zone in which the structure would be visible, and testimony from residents about how the facility would interrupt the scenery. *VoiceStream*, 342 F.3d at 832. Likewise, in *Helcher*, substantial evidence that a tower was inharmonious with the character of a bucolic landscape consisted of photographic representations coupled with testimony from residents who bought land and built homes there because of the natural views. *Helcher*, 595 F.3d at 724. In contrast, testimony from locals "that they don't like poles in general" wasn't substantial evidence to support an administrative decision, else mere "blanket opposition" would effectively eliminate the TCA's substantial evidence provision. *PrimeCo*, 352 F.3d at 1150.

One of the BZA's reasons for denying the petition was that the proposed tower would be "unsightly" and would "harm the natural viewshed of the surrounding properties" [R. 13].[5] In addition to residential homes, the proposed site of Verizon's wireless facility was among a dense wood adjacent to or near two Elkhart parks—Pinewood Park and Walker Park [R. 250, 301].

The BZA's reason was supported by substantial evidence. The Elkhart Comprehensive Plan views its "environmental and design strengths," including its parks and rivers, as critical to "future economic development" [R. 903]. The Plan calls Elkhart's natural resources "inherent components" of the city, and views "the provision of adequate greenspace and the protection of sensitive environmental areas" as "necessary public facilities similar to infrastructure and utility services" [R. 782]. The Plan declares as one goal the "maintenance of open space and greenways" [*id*.]. The Plan describes Pinewood Park as including a trail system, wooded areas, four tennis courts, and a shared playground with Pinewood Elementary School [R. 907]. It characterizes Walker Park as featuring a walking trail, a play area, and parking, and it recognizes the park for having the "most [] use for a passive park" in Elkhart [R. 908]. The Plan describes Walker Park as having "added much needed acreage to the system in an area where additional park facilities are currently at a minimum" [*id*.]. The BZA was within its authority to view this 135-foot monopole, in the center of all this, as incompatible with the Comprehensive Plan's protection of the city's open space and natural viewshed for both residential homeowners and parkgoers.

Elected or appointed city leaders voiced specific concerns. An Elkhart resident and President of the Parks and Recreation Board testified that there has been significant investment

---

[5] The BZA also said it denied the petition because the "proposed tower will serve as an attractive nuisance" [R. 13], but, in briefing, the BZA declines to defend this as an alternate reason for the denial, explaining it was a "colloquial expression" of an aesthetic concern with the monopole's visual impact.

in Walker Park and that the Parks Board is committed to making it "one of the park system's crown jewels" [R. 301]. He shared that people visit the parks to see trees, enjoy wildlife, spend time outdoors with their families, and appreciate their surroundings, not to see cell towers; and he believed the tower would negatively impact the value of these park assets for the community [R. 192, 301]. Another resident—the City Councilman for the district encompassing the proposed site—explained that this cell tower location is not aesthetically harmonious with the city parks, not least when the city had other options for Verizon [R. 166]. He explained that the surrounding park area is a major attraction, including for nearby Pinewood Elementary School, because of the playground, athletic facilities, and natural woodlands; and he said the community likes that the natural scenery isn't interrupted by an artificial structure like a cell tower [R. 167].

The record contains maps that document the zone in which the tower would be visible—across the street from Walker Park and adjacent a wooded area of Pinewood Park (near Pinewood Elementary School), where aesthetic impacts would be greatest [R. 6, 249-50]. In a slideshow, Verizon provided a photo-simulation of how the proposed facility would appear, and even then roadside farther down the nearby street [R. 260]. It shows approximately the bottom half of the 135-foot monopole obscured by foliage and the remaining structure towering above the tree line in between the two parks, topped by the tower's bulbous-seeming attachments (whether dishes or radio units) and flanked by nothing other than clear blue sky [R. 260; *see also* R. 208, 254]. Verizon seems to characterize this evidence as showing the monopole's lack of visual interference, but the BZA was entitled to give it a different perspective and different weight. The BZA was likewise entitled to disregard shorter electric poles (seen in the photo-simulation), particularly when residential homeowners and parkgoers often would be enjoying the natural

viewshed from their yards or the park, not streetside from one of the city's main drags. *See Aegerter*, 174 F.3d at 890 (affirming city's ability to treat utility poles differently than a cell tower).

Residents added their own perspectives about the aesthetic harm. Aside the school and two parks, the area seems surrounded by largely residential homes with mature trees. One resident said he moved from Chicago to raise his family in a beautiful place and doesn't want to walk and see a cell tower [R. 171]. He succinctly shared, "they claim that we're not going to be able to see it, but it's 130 feet in the air, so we are going to see it when I walk out" [*id.*]. Another neighbor (with decades spent at the home, at it also was once his mother's home) echoed this, explaining that he gets up in the morning and steps out on his deck with his morning coffee to look at the woods, already laments construction of the nearby Pinewood School gymnasium, and wants to see nature rather than a cell tower [R. 181]. Another resident pointed specifically to the loss of trees just from the placement of the cell tower—a conclusion not hard to credit to some degree given the aerial maps and other record evidence and when even Dolan Realty's presentation called the proposed site a "very heavily wooded lot" [R. 133, 193]. Another resident observed that this tower, at 135 feet, would well exceed the height of the other three towers that Verizon owns in Elkhart (at 33.5 feet, 41.1 feet, and 57.9 feet) [R. 160], thereby speaking precisely to the viewshed above the tree line. A reasonable board member would not be wrong to give weight to views of citizens and homeowners, particularly when substantiated by other evidence in the record and when the proposed use was inconsistent with the area's prescribed R-1 residential zoning. *See Aegerter*, 174 F.3d at 890 (affirming city's judgment based on the same).

In the collective, this record contains more than mere general or speculative opposition to wireless facilities. It goes to the specific character of the proposed site, the anticipated impacts

on the visual harmony of the neighborhood and natural appeal of nearby parkland, and how these impacts will be experienced by residents and recreators. Verizon says the structure will have a slim, unobtrusive profile shielded by trees (something the original staff report mentioned too), and that local testimony was insufficiently objective or specific. Whether the structure's lower half would be unobtrusive and shielded, the company can hardly maintain that evidence of the community's exposure to the upper half was insufficient or inexact when its own maps, schematics, and photo-simulation show a gadget-topped obelisk looming over the woodland in such a way as to draw this ire from citizens about the lost natural viewshed.

The testimony and record evidence about aesthetics also was specific to the site and surrounding area. Verizon points to a nearby communication tower at the school to suggest that its monopole would be no more obtrusive, but the company offers little information about this other tower, its size or footprint, when it was installed *vis-à-vis* the development of these homes or parks, or its interference with viewpoints of homeowners or parkgoers (notably, it never appears on Verizon's photo-simulation). And the BZA would remain perfectly within its right, based on this record, to deem two towers as worse than one and thus to treat this new monopole, given its height, design, and different location, an aesthetic harm to the viewshed. The evidence of the monopole's interference with the natural setting came not just from those in the know who lived there but at times from certain individuals charged (among others) to assist with aesthetics, development, or the city's urban planning goals, including the President of the Park and Recreation Board and City Councilman, both uniquely situated to opine on the negative impacts of the monopole on the parks, parkgoers, the district, and the Comprehensive Plan— not least to preserve rarer idyllic settings in among the city.

Given the planned height of the proposed facility, the prepared mock-up, the maps, the photo-simulation, the pre-established aims for Pinewood Park and Walker Park, the focus of open space preservation within the Comprehensive Plan, statements from stewards of the public trust, and the community statements specific to the aesthetic quality of the area, substantial evidence supported the BZA's decision to deny the variance based on the finding that the viewshed, including the aesthetics of the city's park system and surrounding residential homes, would be negatively affected. There need only be some evidence—some evidence that would support the variance denial as a reasonable conclusion. That exists here. Whether the court might or might not agree with the aesthetic judgment is an entirely different question, and one not called upon under the law for the court to make, for the court may not substitute its judgment for that of the BZA. *See PrimeCo Pers. Commc'ns, L.P. v. Vill. of Fox Lake*, 35 F. Supp.2d 643, 649 (N.D. Ill. 1999); *see also Aegerter*, 174 F.3d at 889-90; *Preferred Sites, LLC v. Troup Cnty.*, 296 F.3d 1210, 1218-19 (11th Cir. 2002); *360 Commc'ns Co. v. Bd. of Supervisors*, 211 F.3d 79, 84 (4th Cir. 2000). This was an aesthetic judgment that the board grounded in the specifics of this case based on substantial evidence. *See Helcher*, 595 F.3d at 725 (holding same and citing cases); *VoiceStream*, 342 F.3d at 831 (affirming finding that proposed toward would have an "adverse visual impact" on the riverway and surrounding area). Accordingly, the court must affirm.

2. *Compatibility with Single-Family Residential Use.*

In denying the variance, the BZA also reasoned that the proposed tower was "not compatible with the zoning ordinance in the R-1 district" because it would "interfere substantially with the comprehensive plan [that] calls for low-density residential uses" [R. 13]. Elkhart's zoning ordinance only permits a variance when the BZA finds that "strict application of [the ordinance]

20

will constitute an unnecessary hardship if applied to the property" and the "approval does not interfere substantially with the Comprehensive Plan" [R. 761]. In so doing, the ordinance required Verizon's proposal to comply with not just the ordinance but also the Comprehensive Plan.

The proposed site is zoned R-1 [R. 2], a designation "designed to provide for the lowest density single-family residential development" and intended to "protect and conserve existing and future residential development" [R. 667]. It lists one-family detached dwellings, home occupations, and accessory structures among permitted uses [*id.*].[6] A 135-foot wireless monopole isn't a permitted use [*id.*]. The BZA returns to the Comprehensive Plan for a different purpose than aesthetics or the monopole's effect on the natural viewshed and instead frames the argument as a substantial interference with existing or future land use.

Here the scent grows cold. The court cannot track the rationale with substantial support from the record. Though the parties submit the Comprehensive Plan—a robust document of more than 220 pages [R. 770-993]—neither side seems to cite to it in briefing on this point. It's difficult to pinpoint the proposed site in the Plan's map designating future land uses, and it appears to be in a region in which designations for low-density residential, recreation/park, and institutional uses border each other [R. 875], making the task more challenging. That said, Verizon agrees that the Plan calls for the property's future uses to be limited to low-density residential uses, so the court accepts it as accurate without wading unguided through a larger 999-page record. In sum, the Plan converges with the ordinance to maintain the current and future residential uses for this property.

---

[6] Other permitted uses include temporary structures used for construction, domestic animals, rummage sales, police and fire stations, state licensed sheltered living homes, and radio towers owned by federally licensed amateur radio operators [R. 667].

From there, the BZA really just recites the ordinance or cites to testimony reciting the ordinance. Merely reciting the ordinance isn't substantial evidence, and that is materially what the BZA (and revised staff letter) did in its administrative rehearing on this point. *See, e.g., T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield*, 691 F.3d 794, 801 (6th Cir. 2012). Substantial evidence cannot amount to a mere tautology—in other words, Verizon could not have the variance because it needed a variance. It is near axiomatic that a variance petition would concern a proposed use that is inconsistent with existing ordinances or plans, else no variance would be needed. The zoning ordinance acknowledges as much, permitting a variance only when its strict application would cause "unnecessary hardship" and when it would not "interfere substantially" with the Comprehensive Plan. Neither side interprets these terms, but the lingering question on this record remains how—how (outside of the aesthetic question that the court has already addressed) would the proposed tower interfere precisely with existing and reserved future low-density residential uses? After all, the site was located on one homeowner's property.

Verizon argues that the proposed tower presents no conflict or interference because it won't increase home density. The zoning ordinance describes the R-1 district in terms of permitted uses, not effects [R. 667], and the Comprehensive Plan applies those uses into the future [R. 874-75]. Verizon presents no reason why its metric of increased home density should be the BZA's sole yardstick for the variance's compatibility with the ordinance and Plan rather than permitted and planned future uses. Verizon nonetheless has a broader point that, if in fact there is a demonstrated need (and some hardship on the property owner without a variance), the tower's placement would not interfere, much less substantially, with existing or future residential uses. There is no substantial evidence in the record that the variance would interfere with existing

residential development. And it would seem highly unlikely that the property where this tower was proposed, cabined by the school on one side, the park on the other, a public thoroughfare on the other, and an independent living facility on the last side would offer much prospect of future residential development, or that the tower would impede it, even if the home already there was demolished and the modest land (about 2.23 acres according to public sources) was subdivided for alternative residential use.

The BZA scratches together little on appeal to support its administrative conclusion in this lone respect. At the hearing, one resident opposed to the tower noted that the R-1 zone's purpose is to provide low-density single home residential development with a larger lot and to protect and conserve current and future such uses [R. 173], but that just restates the obvious reading of the ordinance. Another resident pointed out that situating the cell tower in an R-1 zone would conflict with its intended uses [R. 162]—again, really just a restatement of the ordinance. Without eroding the BZA's legitimate aesthetic concerns based on substantial evidence in the record, the court cannot say BZA's alternative focus on low-density residential uses, as a mere reiteration of the ordinance, constitutes substantial evidence.

3. *Property Values.*

Another of the BZA's justifications for denying the use variance was that the "proposed tower will adversely affect the property values of the surrounding properties" [R. 13]. A locality can reasonably consider a wireless facility's adverse effects on surrounding property values. *See PrimeCo*, 352 F.3d at 1149 (citations omitted). In fact, Elkhart's zoning ordinance only permits a variance when the "value of the area adjacent to the property included in the variance will not be affected in a substantially adverse manner" [R. 760].

"[G]eneralized concerns about a potential decrease in property values" falls short, *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 496 (2d Cir. 1999); *see New Par v. City of Saginaw*, 301 F.3d 390, 399 n.4 (6th Cir. 2002), *abrogated on other grounds*, *Roswell*, 574 U.S. 293; *Omnipoint Corp. v. Zoning Hearing Bd.*, 181 F.3d 403, 409 (3rd Cir. 1999), particularly when confronted with contradictory expert testimony, *see Oyster Bay*, 166 F.3d at 496; *see also AT&T Wireless PCS, Inc. v. Town of Porter*, 203 F. Supp.2d 985, 996-97 (N.D. Ind. 2002) (citing cases and observing that providers with successful TCA substantial evidence claims almost invariably provide affirmative independent evidence that the proposed facility won't adversely impact property values). On the other hand, evidence that is reasonably specific and tied to the locality might suffice. *See, e.g.*, *Am. Tower LP v. City of Huntsville*, 295 F.3d 1203, 1208 (11th Cir. 2002) (substantial evidence when local resident and realtor testified that, in her 16 years of experience, notice of a proposed wireless tower in a neighborhood made it harder to sell homes there, devaluing the property).

At the BZA rehearing, Verizon presented a report from a certified appraiser (CohnReznick) who found that cell towers don't negatively impact adjacent property values [R. 267]. The findings were based on peer-authored studies from other real estate valuation experts, an assessment of local home sales near existing cell towers, and an interview with the local assessor [R. 265-66]. The owner of the property seeking the variance testified that, based on her ten years of experience as a real estate broker, she has no concerns about the proposed tower adversely affecting property values [R. 148-49]. Another person who manages two real estate offices and has "long been in the business" suggested that inadequate cell service, more than the tower, could have the effect of harming property values [R. 296].

In response, the BZA heard little to combat these skilled assessments of property values. One resident said the proposed wireless facility would devalue a nearby home if he were to buy it because it disrupts the scenery [R. 165], but that perhaps speaks more to aesthetics than to real estate valuation. Another resident cited a study of homes in Savannah, Georgia that he said suggested a nearby cell tower could reduce home prices by up to 7.6 percent, and a study of Mobile County, Alabama that he said found proximity to a cell tower decreased home values by 2.65 percent on average [R. 170]. These studies seem not to be a part of this record, nor this person's credentials to speak to them. A third resident said she had seen "several things" from real estate agents saying cell towers can decrease nearby home values by up to 20 percent [R. 188]. Finally, the staff report found that the proposed tower could negatively impact the value of surrounding homes [R. 456], but the report never explains how and on what basis staff came to that new finding in 2025 after it earlier determined in 2023 that property values would not be substantially undercut [R. 459].

This record lacks substantial evidence that the proposed facility would adversely impact property values. A vague reference to conversations with unidentified real estate agents isn't really evidence before the board, and the reference to property values in the staff report is effectively just its say-so too. Another resident's account of two studies concerning home values in the American southeast isn't a reasonable basis for rejecting the variance here in the northern Midwest when it is contested by the findings of a certified appraiser who not only reviewed (and cited) studies but also assessed the Elkhart housing environment specifically. Only one resident testified that he would value a home near the proposed monopole less if he were a prospective buyer; though this certainly speaks to his fair perspective, it cannot support a broader finding

about home values throughout the surrounding neighborhoods in the face of the certified appraiser's report and contrary testimony from an experienced real estate broker. The court cannot find substantial evidence that supports the BZA's determination that the proposed tower would adversely affect property values of the surrounding properties.

4. *Staff Report.*

The BZA said one reason it denied the variance is because it agreed with staff's recommendations in an amended report [R. 13]. Verizon says the amended report [R. 455-57] is an improper basis for a decision because it is contradicted by the record and the original staff report [R. 458-59]. The BZA says the staff's recommendation is purely advisory and it was permitted to accept or deny it.

That the staff report sometimes provides reasons for denying the variance—reasons the BZA may have been entitled to accept—doesn't mean it constitutes substantial evidence in all respects. The report includes a limited description of the variance petition (some of which is described as "analysis") and staff's recommendation, with little rationale explaining how staff reached its conclusions. The staff report, outside of the substantial record evidence that was adduced at the hearing to support the staff's conclusion that this tower would be injurious to the natural viewshed of the surrounding properties, cannot alone be deemed enough evidence on which a reasonable mind could accept as adequate. *See Helcher*, 595 F.3d at 723. Standing alone, the staff report is not substantial evidence.

5. *Conclusion on Substantial Evidence.*

In the end, the BZA had substantial evidence to support one of its four reasons for denying the variance. One reason is enough, for Verizon, as the party challenging the locality's

26

decision, bears the burden of proving that the decision lacked the support of substantial evidence. *See Helcher*, 595 F.3d at 723. As much as Congress may have enacted the TCA to "encourage the rapid deployment of new telecommunications technologies," *Rancho Palos Verdes*, 544 U.S. at 115 (quotations and citation omitted), Congress was clear that this encouragement wasn't at the expense of "the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities," 47 U.S.C. § 332(c)(7)(A). Nothing in the TCA prohibits the BZA from applying a nondiscriminatory standard from Elkhart's zoning ordinance and Comprehensive Plan that exalts aesthetic harmony and preserves open space as a prominent goal. *See VoiceStream*, 342 F.3d at 831. "By leaving most of the substantive authority to approve the location of personal wireless service facilities in the hands of state or local governments, Congress must have known that exactly the kind of decision the [BZA] reached would occur from time to time." *Aegerter*, 174 F.3d at 891. The court grants judgment for the BZA on count two based on substantial evidence within the administrative record for its aesthetic judgment.

   C.   *Radio Frequency Emissions (Count Three).*

   Verizon's second amended complaint alleges the BZA violated the TCA by denying the variance based on the environmental effects of radio frequency emissions. *See* 47 U.S.C. § 332(c)(7)(B)(iv). The BZA says it is entitled to summary judgment on this count, and Verizon merely says community testimony about radio frequency emissions "could have" tainted the BZA's decision. This is based on mere speculation. Though some hearing testimony concerned such emissions [R. 301], it was sparse, and the board made clear that it could not deny a petition on that basis [R. 129]. The BZA never cited emissions as a reason for denying the variance [R.

13]. There is no evidence the BZA's decision relied on the effects of radio frequency emissions. The court thus grants the BZA summary judgment on count three as a matter of law.

D. *Effective Prohibition (Count Four).*

There was substantial evidence to support the BZA's variance denial, but Verizon next claims the decision effectively prohibits the company from providing wireless communication services. The TCA forbids as much: a local government "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). The BZA answers that there is no evidence of effective prohibition. Each asks for summary judgment on the claim, and the court proceeds accordingly. *See Helcher*, 595 F.3d at 729 (affirming summary judgment); *VoiceStream*, 342 F.3d at 836 (same).

Verizon and the BZA both avoid committing to a single standard for effective prohibition. On one hand, they each acknowledge and argue under the test pronounced in *VoiceStream*, 342 F.3d at 833-35, and employed in *Helcher*, 595 F.3d at 728. Under this test, a wireless provider seeking to prove effective prohibition shoulders the "heavy burden of demonstrating not just that the application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." *Id.* (citation omitted). The provider must show "that its existing application is the only feasible plan and that there are no other potential solutions to the purported problem." *Id.* (quotations and citation omitted). If a provider hasn't thoroughly investigated other viable alternatives, a denial doesn't effectively prohibit provision of wireless services. *VoiceStream*, 342 F.3d at 835. The court decides this question without deference to the local zoning board. *Helcher*, 595 F.3d at 727; *VoiceStream*, 342 F.3d at 833.

On the other hand, Verizon also encourages the court to "elect not to apply the *VoiceStream* test" (to use the company's words) and instead employ a seemingly less stringent "materially inhibits" test promulgated by the Federal Communications Commission in 2018. *See In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv., Declaratory Ruling & Third Report & Order*, 33 FCC Rcd. 9088 ¶ 37 (2018). Certain courts have found that this test permits a finding of effective prohibition when a decision is unreasonably delayed or unreasonable fees, costs, or confounding obstacles are imposed on the provider, and without requiring proof of a coverage gap. *See TowerNorth Dev., LLC v. City of Geneva*, 2024 U.S. Dist. LEXIS 25720, 77-78 (N.D. Ill. Feb. 14, 2024) (citing cases). Verizon doesn't explain why such an election is permissible—an important question given that *VoiceStream* and *Helcher* are binding law—but the company suggests the court has latitude to follow the FCC interpretation under *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024) (unless faced with an explicit statutory delegation, courts exercise independent judgment in deciding whether agency has acted within its authority). Rather than argue one test applies over the other, the BZA hedges and argues both.

Amplifying, yet ultimately dissipating, the confusion are authorities the parties reference but don't always unpack. The BZA cites a case that initially found the Hobbs Administrative Orders Review Act, 28 U.S.C. §§ 2341 *et seq.*, requires lower courts to follow the FCC's test, before seeming to undo this finding. *See TowerNorth Dev., LLC v. City of Geneva*, 2025 U.S. Dist. LEXIS 61455, 37-38 (N.D. Ill. Mar. 31, 2025) (finding that petitioner failed to prove effective prohibition under "materially inhibits" standard), *modified by TowerNorth Dev., LLC v. City of Geneva*, 2025 U.S. Dist. LEXIS 191427, 18 (N.D. Ill. Sep. 29, 2025) (granting motion to reconsider "materially inhibits" finding); *see also* 28 U.S.C. § 2342(a)(1) (court of appeals "has exclusive

jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" FCC orders); *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 447-48 (7th Cir. 2010) (interpreting the Hobbs Act). For its part, Verizon cites *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 152 (2025), which held that the Hobbs Act doesn't preclude lower courts from independently assessing whether an agency's interpretation of a statute is correct. This brings the court full circle—the Hobbs Act doesn't require application of the FCC's "materially inhibits" test, so the test employed in *VoiceStream* and *Helcher* remains the law. The court of appeals decides what effective prohibition means, not the FCC. A contrary conclusion from this court would sit above its pay grade.

Verizon claims to meet the *VoiceStream* test. The company says, after Elkhart voided the lease for its proposed location in Pinewood Park, it considered various sites for a wireless facility that would fill the coverage gap. Among fourteen alternative sites, the company argues today that the Bristol Street location is the only one that can fill the gap. As proof, Verizon points to Dolan Realty's presentation at the March 2025 hearing and to paperwork for the unworkable Pinewood Park site. In response, the BZA disputes that a coverage gap exists and further argues that Verizon has failed to exhaust alternative sites for the tower.

Verizon has not met its burden on effective prohibition. The company falls far short of demonstrating a thorough investigation concluding that the existing application is the only feasible plan and there are no other potential sites available. The only evidence it cites concerning its investigation into alternate locations is Dolan Realty's presentation at the March 2025 hearing. Mr. Dolan said the Bristol Street location (called at times by Verizon the Southeast Cassopolis site) would provide "better coverage and capacity" and serve as "the best site" among the

fourteen considered in the search area, whereas others were "lesser . . . either through reasons of stormwater, flood plain, not enough room, not enough size, perhaps a landlord that was not interested" [R. 135, 195-96], or because the others offered no "coverage or concealment" [R. 133]. Dolan Realty advised that the site would offer a "much more robust system" for first responders and the school [R. 142]. Verizon's counsel echoed the same at the hearing, saying the company "studied many other possible locations" and the Bristol Street site was "the best location in the search ring" [R. 200].

What might be the "best" in the company's eyes and what has been "effectively prohibited" are two different things. The TCA was not enacted to give carriers an avenue to coerce municipalities into approving carrier-preferred sites notwithstanding any detrimental effect or inconsistency with municipal development plans or goals. The TCA was not meant to force "every municipality [to] have towers wherever anyone wants to put them." *Aegerter*, 174 F.3d at 891. Verizon must establish that this was the only feasible plan, with no other potential solutions to its coverage preferences. *See VoiceStream*, 342 F.3d at 834.

Even assuming a likely coverage gap, though there seems to be some hearty debate on that issue that the court need not resolve, Verizon has not met its burden of showing effective prohibition. First, the record provides scant information about the company's investigation into alternative sites. Verizon cites Dolan Realty's and counsel's bare summary of the company's investigation, rather than records of the investigations themselves or any precise analysis. Its presentation was general, so there are no specific details about precisely why this site was the only feasible one, which alternative sites were considered, or why each was disqualified, if even they were for anything more than the company's mere preferences. The court cannot fully assess the

investigation, much less call it "thorough" on this record. *See VoiceStream*, 342 F.3d at 835; *cf. Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 42-43, 53 (1st Cir. 2009) (detailed evidence of provider's systematic search and efforts to secure sites); *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 995 (9th Cir. 2009) (record "included an analysis of eighteen alternative sites").

Second, the evidence doesn't show that other potential solutions are unavailable. *See Helcher*, 595 F.3d at 728. The presentation before the BZA characterized the Bristol Street location as the "best" spot [R. 196, 200], albeit only from the company's perspective, but not the only feasible one or even effectively so. That isn't enough to demonstrate that some inferior site (a "lesser" one as the board presentation called it) would not still be feasible, indeed adequate. Just as an example, Dolan Realty referred to an open field by a church, which Verizon apparently eliminated merely because there was no concealment for the facility, preferring the heavily wooded lot instead. That alone fails to meet Verizon's burden; indeed, it tends to be counter-evidence that demonstrates another feasible site exists. *See VoiceStream*, 342 F.3d at 834 (carrier has burden to show "no other potential solutions" exist). The company just preferred this one. Perhaps others exist too, perhaps not, but the record remains devoid of a sound basis to exclude these other alluded-to possibilities based on the need for a thorough investigation.

Third, Verizon hasn't shown that further efforts would be a waste of time. *See id.* The parties cite to very little information about efforts between the company and Elkhart to find a mutually agreeable site. Verizon explains that it previously leased a site from the Elkhart Board of Parks and Recreation in Pinewood Park that was scuppered when the lease proved invalid [R. 504-594]. Verizon wants to make hay of this prior instance to show that the city has been predesigned to prohibit an additional tower, but this fairly strikes as speculation. The BZA

clarifies that the Board of Parks and Recreation applied for a use variance, until the city determined that the board lacked authority to enter the lease [R. 594]. *See* Ind. Code. 36-10-3-11(b). Verizon never establishes that this was erroneous or that somehow the city was using this as arbitrary cover to prohibit the company's efforts at cell tower placement. Beyond this and the record of Verizon's pursuit of a use variance for the Bristol Street site, Verizon cites no other documentation of the company's negotiations with Elkhart to find a site to close the gap.

The record is so devoid of evidence of effective prohibition that the court (or a reasonable factfinder) cannot say Verizon has met its burden. There aren't material questions about the conclusions to be drawn here. Rather, the investigation materially isn't in the record, and Verizon's own evidence fails to establish there are no alternatives. The court denies judgment for Verizon on effective prohibition and grants summary judgment to the BZA.

E. *Reasonable Period of Time (Count Five).*

Under the TCA, a locality must act on a variance petition "within a reasonable period of time." 47 U.S.C. § 332(c)(7)(B)(ii). Verizon says the BZA's decision wasn't within a reasonable time and cites the FCC's so-called "shot clock," under which reasonableness is presumed when the petition is acted upon within 150 days. *See* 47 C.F.R. § 1.6003(b), (c)(1)(iv). This too is well-trod ground—the court previously addressed similar arguments from Verizon in its order denying the company's motion to alter or amend the prior decision. The BZA says Verizon improperly asserts a new claim because the argument isn't in the second amended complaint and that Verizon shouldn't be allowed to amend again.

But this isn't a new claim—at most, perhaps it's a new theory, and even then not really new. A claim is a set of operative facts that produces a legal right and entitlement to a remedy,

whereas a legal theory is the vehicle for pursuing the claim. *Signal Funding, LLC v. Sugar Felsenthal Grais & Helsinger LLP*, 136 F.4th 718, 724 (7th Cir. 2025). In rare circumstances, a court may permit a plaintiff to amend her complaint constructively based on new claims asserted in briefing, but the plaintiff retains independent latitude to "alter the legal theories asserted in [the] complaint" at summary judgment. *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023). Verizon's second amended complaint includes the timeline of when it filed its petition and when the BZA reached its decision, so the BZA had fair notice of the operative facts. *See id.* And, once more, this has been an issue throughout this proceeding that the court would be hard-pressed to call it anything but preserved. Accordingly, nothing impedes Verizon from articulating the shot clock theory at this stage.

That said, Verizon's arguments go no further today than they did before. The court already explained that the BZA will have acted within a reasonable period of time if it came to a decision on the tight schedule directed by the court, and that some delay was due to Verizon's manner of pursuing judicial review, more than once in the prior episode. The BZA's decision was originally within time, and on remand was within time. Indeed, adding both time periods together, the BZA still acted within 150 total days—in fact, only 89 days—so Verizon's point is difficult to fathom.[7] The TCA provides for expedited review, not relief. *See Cellco P'ship*, 765 F. Supp.3d at 774. Even so, nothing alters the court's view that the BZA came to its decision with reasonable expediency. There has been no TCA violation under 47 U.S.C. § 332(c)(7)(B)(ii) or, for that matter, any other

---

[7] Using the regulation as the parties do, the BZA's "shot clock" began the day after the Trust submitted the variance petition on August 7, 2023 [R. 1]. *See* 47 C.F.R. § 1.6003(c). The BZA's first denial letter on September 27, 2023 [R. 8] decided the petition 51 days later. *See Roswell*, 574 U.S. at 305 n.4 (final action is issuance of written notice of denial). Then, the BZA's second denial letter on March 17, 2025 [R. 13] provided a decision 38 days after the court's February 7, 2025 order denying Verizon's Rule 59(e) motion and confirming the remand [52]. Accordingly, together, the BZA acted within 89 days.

TCA provision, as alleged. As there are no grounds for a declaratory judgment that the BZA's decision violated the TCA, the court grants summary judgment on count five to the BZA.

F.  *Indiana Law (Count Six).*

Verizon says the BZA's variance denial violates Indiana law because it was unsupported by substantial evidence, was arbitrary and capricious, and impermissibly relied on the amended staff report. A locality's zoning decision must not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." Ind. Code §§ 36-7-4-1614(d)(1), (5). "An administrative act is arbitrary and capricious only where it is willful and unreasonable, without consideration and in disregard of the facts and circumstances of the case, or without some basis that would lead a reasonable and honest person to the same conclusion." *Rice v. Allen Cnty. Plan Comm'n*, 852 N.E.2d 591, 597 (Ind. Ct. App. 2006) (citing *Equicor Dev., Inc. v. Westfield-Washington Twp. Plan Comm'n*, 758 N.E.2d 34, 37 (Ind. 2001)). Substantial evidence review in the TCA is the same as under Indiana law. *St. Charles Tower, Inc. v. Bd. of Zoning Appeals*, 873 N.E.2d 598, 601 (Ind. 2007).

The BZA says Verizon's state claim is barred for its failure to exhaust administrative remedies and to seek review in timely fashion. A person may petition for judicial review of an adverse decision by a zoning board "only after exhausting all administrative remedies available within the board whose zoning decision is being challenged." Ind. Code § 36-7-4-1604(a). "Courts enforce the legislature's exhaustion requirement strictly so premature litigation may be avoided, an adequate record for judicial review may be compiled and the board may retain the opportunity and autonomy to correct its own errors." *Willow Haven on 106th St., LLC v. Nagireddy*, 252 N.E.3d 418, 423 (Ind. 2025) (citation modified).

The BZA's letter denying the use variance described the administrative process for contesting a decision. "Any petitioner may, within fourteen (14) days after a decision by the [BZA], file with the [BZA] a motion for a rehearing of such petition. The only grounds for such rehearing shall be the alleged illegality of the [BZA] in making its decision and/or the discovery by the petitioner of factual information after the close of the public hearing, which justifies reconsideration of the petition" [R. 13]. The BZA noted this process at the start of the March 2025 hearing too [R. 292].

Verizon didn't seek a rehearing, and the BZA says this is fatal. But the court can't agree for two reasons. First, Verizon wasn't the petitioner, the one entitled to request a rehearing. Rather, the petitioner was Heidi Gaskill for the Trust [R. 1]. Verizon can't have failed to exhaust a procedure that wasn't accessible to it. Verizon pursued the avenue for review the BZA said was available to another "interested party"—an appeal [R. 292]. Second, the BZA presented a petition for rehearing as permissive, not mandatory, both in its letter and at the hearing [R. 13, 292]. Even if Verizon were the petitioner, the BZA can't fairly argue Verizon failed to exhaust a process that exists merely as an option.

Still, Verizon filed its appeal late under Indiana law. An untimely petition for review of a zoning decision "waives the person's right to judicial review." Ind. Code § 36-7-4-1604(b). "A petition for review is timely only if the petition for review is filed not later than thirty (30) days after the date of the zoning decision." Ind. Code § 36-7-4-1605. Though for purposes of the TCA a locality's decision is final when it issues its written notice of denial, *Roswell*, 574 U.S. at 305 n.4, under Indiana law "a board of zoning appeals makes its decision at the conclusion of the hearing on the matter," *Town of Darmstadt v. CWK Inv.-Hillsdale, LLC*, 114 N.E.3d 11, 17 (Ind. Ct. App.

2018). For the BZA's use variance denial, that was March 13, 2025 [R. 292]. Verizon filed its first amended complaint appealing the denial on April 17, 2025 [61]—35 days later. Thus, the petition for review is untimely under Indiana law.

Verizon describes this result as formalistic, noting that March 13 was merely the date of the BZA's oral decision. But the statute speaks in terms of the board's decision, not a written decision, much less a later written synopsis. *See* Ind. Code § 36-7-4-1605. And prior Indiana law existed to spell this out. *See Town of Darmstadt*, 114 N.E.3d at 17. This federal court has no business altering clear Indiana law.

Verizon also asks for the 30-day window to be tolled under the equitable estoppel doctrine, which applies when "a party's actions prevent another party from obtaining the requisite knowledge to pursue a claim." *Kenworth of Indianapolis, Inc. v. Seventy-Seven Ltd.*, 134 N.E.3d 370, 383 (Ind. 2019). Verizon doesn't explain how the BZA made a representation designed to stymie the company's access to judicial review. The court can't imagine one—the BZA notified Verizon of the 30-day deadline, in line with the statute, at the start of the March 2025 hearing [R. 292].

*Equicor*, 758 N.E.2d at 39-40, which Verizon cites in support along with the changed staff recommendation, is inapposite because the locality there was estopped from basing a zoning decision on an issue it never raised with the petitioner in a string of hearings that preceded its denial vote. Here, Verizon's deficiency is its untimely pursuit of judicial review, an issue unaffected by the staff report that preceded the hearing date and BZA decision at the hearing. The questions of disharmony with the Comprehensive Plan (always in play because of what the zoning ordinance says) and aesthetics (based on arguments by the BZA since the first round of briefing) have been issues throughout this proceeding, so it was no surprise to Verizon come the

March 2025 hearing on remand. Indeed, the court forecasted Verizon's ability to address BZA's concerns with new statements or evidence, an opportunity the company in part took on remand. *See Cellco P'ship*, 765 F. Supp.3d at 774 ("And for all the fear of sandbagging now, Verizon has an insight into what might worry the BZA and has every opportunity to address that with new evidence too. In that dialogue or process to come, the parties may see it differently.").

Perhaps to lend some comfort, even were Verizon's petition timely, the court would grant judgment on the Indiana claim. The BZA's decision was based on substantial evidence, so it was not arbitrary and capricious. *See Senter v. Kosciusco Cnty. Bd. of Zoning Appeals*, 251 N.E.3d 584, 587 (Ind. Ct. App. 2025). The court grants judgment to the BZA on count six.

CONCLUSION

The court acknowledges the plights of both Verizon and the BZA. Verizon seeks to bridge a wireless coverage gap, whereas the BZA aims to ensure that the location of whatever facility is built harmoniously serves community needs and respects salutary development goals. The TCA balances these priorities and encourages cooperation to find a suitable placement. Though a court may occasionally referee this process, the result today is that the parties must return to the drawing board because the BZA had substantial evidence for denying the monopole's placement at this particular location.

The court DENIES Verizon's motion for judgment [82], GRANTS the BZA's motion [86], as stated here, and DIRECTS the clerk to enter final judgment for the BZA. This decision will terminate the case.

SO ORDERED.

January 9, 2026                                          *s/ Damon R. Leichty*
                                                        Judge, United States District Court